UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

                                 :

T.C. and A.C., *individually and on behalf of* :
*A.C.*,

                                 :

                Plaintiffs, :

                                 :

               v.                 :

                                 :

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                                 :

                 Defendant. :

                                 :

------------------------------------------------ X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>August 24, 2016</u> |

15 Civ. 2667 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

        Plaintiffs T.C. and A.C., individually and on behalf of A.C. (collectively, "Plaintiffs"), bring this action against the New York City Department of Education ("Defendant" or the "DOE"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1409, 1411-1419, 1431-1444; Article 89 of the New York State Education Law, N.Y. Educ. Law §§ 4401-4410, and Part 200 of the Commissioner's Regulations, N.Y. Comp. Codes R. & Regs. tit. 8, Parts 200-201.[1]  Plaintiffs bring this action (i) to seek direct funding from the DOE of tuition at the Rebecca School for the 2011-2012 school year (including reimbursement for payments made), and (ii) to seek

---

[1]     The Court does not expressly name the child or the parents because "in an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court." *P.M.* v. *Evans-Brant Cent. Sch. Dist.*, No. 08 Civ. 168A (RJA), 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008); *see also* Fed. R. Civ. P. 5.2(a); 20 U.S.C. § 1417(c).

review of a December 8, 2014 decision of the State Review Officer (the "SRO")
that effectively denied Plaintiffs the ability to recover those costs from the DOE.

The parties have cross-moved for summary judgment. For the reasons
set forth below, the Court remands the matter to the SRO on the limited issue
of whether the Individualized Education Program ("IEP") developed for A.C. was
reasonably calculated to enable him to make educational progress in light of
the IEP's implicit adoption of one specific methodology as to certain goals, and
otherwise upholds the decision of the SRO.

## BACKGROUND[2]

As is frequent in IDEA cases, this case is resolved short of trial, by
means of competing summary judgment motions. The Court's inquiry in IDEA
cases is "fact-intensive," and therefore, it is "necessary to set forth in some
detail the facts" presented in the record. *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d
167, 175 (2d Cir. 2012).

## A.    The Legal Framework

The IDEA "requires States to provide disabled children with a 'free
appropriate public education'" (a "FAPE"). *Florence County Sch. Dist. Four* v.

---

[2]    The facts set forth herein are drawn from the administrative record of the proceedings
below ("R. [page]"), which comprises the transcript of the hearing before the Impartial
Hearing Officer (the "IHO"), the exhibits introduced during that hearing, and the
decisions of the IHO and the SRO. While these documents and transcripts are not
organized chronologically, the Court finds the clearest method of reference to be that
used by the parties in their assembly of the record. For convenience, Plaintiffs' opening
brief is referred to as "Pl. Br." (Dkt. #11); Defendant's opening brief and opposition as
"Def. Br." (Dkt. #15); Plaintiffs' reply and opposition as "Pl. Opp." (Dkt. #16); and
Defendant's reply as "Def. Reply" (Dkt. #17), all referenced according to their ECF
pagination. The Court waived the requirement that the parties submit Local Rule 56.1
Statements at the request of the parties. (*See* Dkt. #8).

*Carter*, 510 U.S. 7, 9 (1993) (internal citation omitted); *see also R.E.*, 694 F.3d at 175.  As part of the IDEA, school districts must create an IEP for each qualifying child in order to ensure that the child receives a FAPE.  *See R.E.*, 694 F.3d at 175.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A).  The crux of the IDEA is the mandate that the IEP be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

In New York State, each school district has a Committee on Special Education ("CSE") that bears responsibility for developing IEPs for qualifying students within that district.  *Gagliardo*, 489 F.3d at 107.  A CSE is "comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a

school board representative, [and] a parent representative," and it may include others.  *R.E.*, 694 F.3d at 175.

If a parent believes that his or her child's IEP fails to comply with the IDEA, the parent may seek relief by filing a due process complaint with the appropriate state agency.  20 U.S.C. § 1415(b)(6).  Federal law mandates that, upon the filing of a due process complaint, the parent be provided with an impartial due process hearing before an IHO.  *Id.* § 1415(f).  New York law, in turn, requires a parent to pursue his or her claim first before an IHO; once the IHO renders a decision, either party may appeal the decision to an SRO.  N.Y. Educ. Law §§ 4404(1), (2).  After the SRO completes his or her review of the IHO's decision, either party may file an action in state or federal court seeking review of the SRO's decision.  20 U.S.C. § 1415(i)(2)(A).

**B.   Factual Background**

   **1.   A.C.'s Disability Classification and Placement Before the 2011-2012 Academic Year**

Plaintiff child A.C. is a now-12-year-old boy whom the DOE has classified as autistic and who is accordingly entitled to a FAPE.  At the time the relevant IEP was being developed, A.C. was approximately six years old.  (R. 77).  According to T.C., A.C.'s mother, when she initially attempted to enroll A.C. in a pre-school, she was notified that she should seek an autism evaluation for her son.  (*Id.* at 798-99).  A.C. was subsequently diagnosed with autism and placed, for the 2009-2010 academic year, at the New York Institute for Special Education.  (*Id.* at 799).

4

For the 2010-2011 academic year, T.C. sought a placement for A.C.'s kindergarten year.  (R. 800).  Ultimately, however, T.C. "wasn't pleased with" the placement.  (*Id.*).  T.C. stated that, around the same time she sought a placement, she "started doing [her] own research, and [she] started doing some DIR at the house, and [she] really saw a difference in [A.C.] and his ability to engage with [T.C.] personally."  (*Id.* at 801).[3]  As a result, T.C. enrolled A.C. for the 2010-2011 year at the Rebecca School due to its use of the DIR methodology.  (*Id.* at 800-01).[4]

### 2.   The March 28, 2011 CSE Meeting and Materials Considered[5]

The following year, on March 28, 2011, the CSE convened to develop A.C.'s IEP for the 2011-2012 school year (the "CSE meeting").  The CSE attendees included (i) T.C.; (ii) DOE school psychologist Rose Fochetta; (iii) DOE Special Education teacher and District Representative Feng Ye; (iv) A.C.'s Rebecca School teacher Rebecca Lubin; (v) Rebecca School social worker Mandy Zofness; and (vi) Parent Member Sandra Morabito.  (R. 33, 77).[6]

---

[3]   "DIR" refers to "**D**evelopmental **I**ndividual-difference **R**elationship-based" therapy, also called "Floortime"; DIR "is primarily based on helping the child build relationships and reach a higher developmental level."  *R.E.*, 694 F.3d at 183 n.1.  The DIR/Floortime model is "an educational technique centered around playful one-on-one interactions between students and staff members while engaged in an activity of the student's choice, by which staff aim to meet the child at their developmental level and then to move them ahead."  *A.D.* v. *Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 690 F. Supp. 2d 193, 199 (S.D.N.Y. 2010) (internal quotation marks omitted).

[4]   "[T]he Rebecca School is a private school for children with autism and other neurodevelopmental delays located in Manhattan."  *J.W.* v. *N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 598 (S.D.N.Y. 2015); *see generally* http://www.rebeccaschool.org/ (last visited Aug. 22, 2016).

[5]   The Court discusses these documents in reverse chronological order.

[6]   "A 'parent member' is a parent of another disabled child or a child who was recently 'declassified' as disabled who participates in the CSE in order to ensure that the parents understand the IEP-formulation process, are 'comfortable' with the IEP team's

According to the Record, a "Notice of IEP Meeting" informing T.C. of the CSE meeting was sent on or about March 2, 2011.  (R. 964).  The notice indicated that the CSE meeting would be attended by Ye (in her capacity as both special education teacher and District Representative), Fochetta (as school psychologist), and Rebecca School staff; the notice also indicated that a Parent Member would be present, although that person's identity was not specified. (*Id.*).

At the March 28, 2011 meeting, the CSE had access to (i) a report of a classroom observation evaluation (the "Observation Report") conducted by Fochetta on January 18, 2011 (R. 985-87); (ii) a Rebecca School Interdisciplinary Report of Progress (the "Progress Report") written in December 2010 (*id.* at 988-1001); (iii) a DOE Psycho-Educational Evaluation Report (the "Psycho-Educational Evaluation") dated February 27, 2009 (*id.* at 1002-04); and (iv) a Social History Update from the New York Institute for Special Education dated October 15, 2008 (*id.* at 1005-07).

### a.     The January 18, 2011 Observation Report

In the Observation Report, Fochetta stated that she observed A.C. in his classroom at the Rebecca School, with teacher Lubin, for approximately 30 minutes.  (R. 985).  Prior to the observation, though, Lubin had informed Fochetta that A.C. "was not having a good day and not behaving in a typical manner."  (*Id.* at 987).  Fochetta initially left with the intention of returning a

---

decisions, and have 'had their concerns adequately addressed.'"  *M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 233 n.8 (2d Cir. 2012).

different day, but Lubin ultimately called her back, "indicating that [A.C.] appeared to have calmed down and improved."  (*Id.*).

Fochetta then observed A.C. and noted observations regarding, *inter alia*, (i) his ability to read and follow instructions during a group activity; (ii) his ability to remain engaged in a group activity and to follow the teacher's instructions; (iii) his participation in a math-based activity; (iv) his request to photocopy certain materials from the math activity before progressing to a new activity; (v) his participation in a "movement group" with an occupational therapist and classmates; and (vi) his separation from that group and resistance to further participation, despite prompting by adults and a peer. (R. 985-87).

### b.   The December 2010 Progress Report

The Progress Report detailed A.C.'s program at Rebecca School, including the 8:1:3 classroom structure,[7] A.C.'s daily activities, and his regular therapy sessions.  (R. 988).  It also described A.C.'s "main passions," his dislikes, and the areas in which he had made progress or still faced significant difficulties.  (*Id.*).  The Progress Report next detailed the various "Educational/Functional Emotional Developmental Levels" within the DIR model, describing A.C.'s strengths and weaknesses in each area; these include (i) Shared Attention and Regulation; (ii) Engagement and Relating; (iii) Two-Way Purposeful Emotional Interaction; (iv) Shared Social Problem Solving;

---

[7]   Such classroom ratios refer to the number of students, teachers, and paraprofessionals in a given class.

(v) Creating Symbols and Ideas; and (vi) Building Logical Bridges Between
Ideas.  (*Id.* at 988-90).  Next, the Progress Report addressed A.C.'s
"Curriculum," including his programs in (i) literacy, focusing on word
recognition, comprehension, fluency, and interest in reading; (ii) math,
focusing on "number sense," money, measurement, time/space, and visual
spatial areas; (iii) social studies, including adapted daily living skills; and
(iv) science and exploration.  (*Id.* at 990-92).

   Next, the Progress Report included an evaluation by A.C.'s occupational
therapist of his progress during his individual and group therapy sessions,
discussing in particular the details of A.C.'s "sensory profile," his "motor
planning and sequencing," and his "visual-spatial processing."  (R. 992-93).
Further, A.C.'s speech-language therapist addressed A.C.'s skills and
difficulties in the areas of pragmatic language, receptive language, expressive
language, and articulation.  (*Id.* at 994-95).  Finally, the Progress Report
detailed A.C.'s receipt of art therapy on a twice-weekly basis.  (*Id.* at 995-96).

   After these reports from A.C.'s teacher and related services providers, the
Progress Report listed long-term and short-term goals in the areas of
(i) DIR/Floortime; (ii) academics, including literacy, math, social studies,
activities of daily living, and science; (iii) occupational therapy; (iv) speech-
language therapy; and (v) art therapy.  (R. 997-1000).

### c.      The February 27, 2009 Psycho-Educational Evaluation

   The Psycho-Educational Evaluation assessed A.C.'s cognitive, social-
emotional functioning, and pre-academic skills; this report listed a "Full Scale

IQ" of 84, classifying A.C.'s cognitive functioning in the "Low Average" range.
(R. 1002-03).  The report further broke this score down into a nonverbal IQ
standard score of 101 and a verbal IQ standard score of 69 (*id.* at 1003), and
assessed that "[a]ll scores measured within the nonverbal area, with the
exception of short-term memory, are within the average range," while "all skills
assessed within the verbal area, with the exception of arithmetical ability, are
within the exceptionally weak range" (*id.*).  According to the Psycho-
Educational Evaluation, A.C. "would probably benefit from a well[-]structured
specialized educational program to help him reach the desired level of academic
achievement," and it recommended that "the Related Services currently being
offered" continue.  (*Id.* at 1004).

### d.     The October 15, 2008 Social History Update

Finally, the Social History Update, dated October 15, 2008, described
A.C.'s family and living situation as of that time.  (R. 1005-06).  It also
mentioned a psychological evaluation conducted in May 2008 and T.C.'s
satisfaction with A.C.'s progress since beginning a "readiness program."  (*Id.*).

### 3.     The 2011-2012 IEP

The IEP developed by the CSE for the 2011-2012 school year
recommended a 12-month school year in a "special class in [a] specialized
school with related services," including a 6:1:1 staffing ratio of students to
teachers to paraprofessionals, in addition to a 1:1 (i.e., assigned only to A.C.)
"transitional paraprofessional."  (R. 966-67).  The IEP also directed the use of
adaptive physical education, plus (i) two 30-minute sessions of individual

speech-language therapy per week; (ii) three 30-minute group (3:1) sessions of speech-language therapy per week; (iii) two 30-minute sessions of individual occupational therapy per week; and (iv) three 30-minute group (2:1) sessions of occupational therapy per week.  (*Id.* at 967, 981).

The IEP noted that a meeting notice had been sent to T.C. on March 2, 2011, with telephonic follow-up on March 24, 2011.  (R. 967).  After the CSE meeting, the IEP and Notice of Recommendation were sent to T.C. on April 4, 2011.  (*Id.*).

The IEP first addressed A.C.'s "Academic Performance and Learning Characteristics," including both his "present performance" and his "academic management needs."  (R. 968).  With regard to "present performance," A.C.'s IEP stated that A.C. had been attending a non-graded private special school since 2009, and his most recent psychological evaluation, dated February 27, 2009, indicated that "his overall cognitive functioning [fell] in the Low Average range."  (*Id.*).  Further, the IEP noted that A.C. could read approximately 100 words, could "answer fact-based but not inferential questions with reading materials at the kindergarten to first grade level," and could "sequence a familiar story with visual support up to 5 steps."  (*Id.*).  This academic performance section also stated that A.C. could "recite familiar stories with fluency and affect," though he had "some difficulties joining in group reading." (*Id.*).  With regard to math, A.C. could "match manipulative quantities up to 20," and was "working on addition of 1 to 20," though he struggled with estimating time.  (*Id.*).  A.C. reportedly was working toward identifying

pennies, nickels, dimes, and their values, "understanding 'more/less,'" and "sequencing 3 events without visual support." (*Id.*).

In the "Reading and Writing" portion of the academic performance section, the IEP referenced teacher observations of both decoding and listening comprehension, with an instructional level of "K to 1st grade range" for listening comprehension. (R. 968). No observations were reflected for reading comprehension or writing. (*Id.*).[8] For math, the IEP reflected a teacher observation in the area of computation, with an instructional level of "K to 1st grade range." (*Id.*). No observation was reflected for problem solving. (*Id.*).[9] For "academic management needs," consisting of "[e]nvironmental modifications and human/material resources," the IEP recommended "[r]edirection; repetition; visual cues; verbal prompts; sensory input and breaks; access to a quiet space; [and] movement during activities." (*Id.*).

Next, the IEP addressed A.C.'s "Social/Emotional Performance," including his "present performance," evaluations of his behavior and the suggested instructional process, and his "social emotional management needs." (R. 969). With regard to his "present performance," the IEP indicated that, based on a Rebecca School report, A.C. could "maintain a calm and regulated state for the majority of the school day," and when regulated, A.C.

---

[8]     Fochetta testified that no observation was recorded for reading comprehension because A.C. had only reached the level of sight recognition of approximately 100 words, and no observation for writing was recorded because A.C. was still developing the fine motor skills required to hold a pencil. (R. 235-37).

[9]     Here, too, because A.C. was not at the level of reading and solving word problems, no observation was recorded. (R. 238).

would "engage[] with both familiar adults and peers." (*Id.*).  When dysregulated over a frustrating interaction, however, A.C. might cry.  (*Id.*). A.C. generally presented with an "under reactive state" when not engaged, and the IEP noted that A.C.'s "engagement [might] be challenged when he is auditorily overwhelmed." (*Id.*).  Further, the IEP stated that if A.C. was "challenged" or felt he was not being heard, he might become upset; however, A.C. was "beginning to verbalize his emotions." (*Id.*).

The IEP also indicated that A.C. could "label basic emotions" and understand others' emotions, though he had more difficulty with his own emotions.  (R. 969).  A.C. reportedly had difficulties "negotiating situations in which objects [were] involved[,] as he exhibit[ed] difficulty with turn taking." (*Id.*).  As the IEP further explained, "[w]hen a peer initiate[d] an interaction with [A.C.], he respond[ed] by closing the circle of communication and [would] often engage with them, with adult support to help him articulate his ideas." (*Id.*).  Additionally, A.C. could "enter into a two way problem solving interaction with adults during highly motivating interactions but require[d] support as he [could] become easily discouraged." (*Id.*).  However, A.C. was "beginning to make the connections between the actions of others and reactions." (*Id.*).  Last, the IEP noted that A.C. might "have difficulty physically joining the group but [could] actively participate from afar." (*Id.*).

The IEP then stated that A.C.'s behavior did "not seriously interfere with instruction," and could be addressed by a special education teacher; the IEP recommended behavioral support including a special education teacher,

occupational therapy, and speech and language therapy.  (R. 969).  Finally, the IEP recommended "social emotional management needs" of (i) "[c]o-regulation with an adult to validate [A.C.'s] emotions," (ii) "[a]ccess to a quiet environment, as well as tactile and proprioceptive input when dysregulated due to frustration," and (iii) "[p]roactive sensory input throughout the day." (*Id.*).  No behavior intervention plan was developed.  (*Id.*).

The "Health and Physical Development" section of the IEP, in relevant part, indicated that A.C. "display[ed] characteristics of a sensory seeking individual," seeking out "vestibular input" and occasionally becoming overly active "as indicated by his moving too fast, speaking too fast, and displaying a lack of safety awareness (inattenti[on] to his physical environment)."  (R. 970). The IEP noted that, when overactive, A.C. might need "verbal reminders to slow his body down."  (*Id.*).  Further, while A.C. was "often visually distractable," he "demonstrated strong auditory processing skills," but he "demonstrate[d] immature fine motor skills."  (*Id.*).  The IEP did not list any medical or healthcare needs, but it recommended adaptive physical education at a 6:1:1 staffing ratio, and noted that "[o]ccupational therapy continues to be warranted."  (*Id.*)

After assessing A.C.'s academic and emotional performance, and his health and physical development, the IEP enumerated a total of 13 annual goals and 43 short-term objectives for A.C.  (R. 971-78).  The annual goals and short-term objectives addressed a range of areas, including A.C.'s (i) decoding, vocabulary, and comprehension skills; (ii) basic math concepts and number

skills; (iii) pre-writing skills; (iv) sensory processing skills; (v) motor planning skills; (vi) visual processing skills; (vi) engagement and pragmatic language skills; (vii) receptive language skills; (viii) expressive language skills; (ix) articulation skills; (x) ability to remain in adult and peer interactions; (xi) ability to remain in "co-regulated interaction[s]"; and (xii) activities of daily living. (*Id.*).  These goals specified numerical targets for success, and each indicated that there would be three progress reports during the 2011-2012 year.  (*Id.*).

With regard to the recommended special class environment, the IEP explained that A.C. "exhibits significant difficulty with socialization and communication that warrants greater support than can be provided in a general education setting," and thus recommended a 6:1:1 class setting with a special education teacher and 1:1 transitional paraprofessional.  (R. 979).

The IEP then addressed the programs and services that the CSE had considered but rejected, noting first that the CSE agreed that A.C. required a 12-month program to avoid any regression in skills.  (R. 980).  Further, the CSE had considered 12:1:1 and 8:1:1 student-teacher-paraprofessional ratios, but had rejected these as "insufficiently supportive" and "simply too large for [A.C.] to make progress and achieve his IEP goals."  (*Id.*).  Finally, a 6:1:1 classroom without the additional 1:1 transitional paraprofessional was rejected as well, as "individual support [was] warranted" during A.C.'s transition from private to public school.  (*Id.*).  Finally, the IEP listed related services

recommendations for A.C., including occupational therapy, speech therapy, and a transitional paraprofessional. (*Id.* at 981).

### 4.      The DOE's Communications with T.C. After the CSE Meeting

At the close of the CSE meeting, the DOE filled out a "Notice of Recommended Deferred Placement," indicating that it would send a recommended placement on or before June 15, 2011, and "[t]he reason to defer placement [was] that [the] IEP [was] developed for the 2011-2012 school year." (R. 965).  Plaintiffs were informed they could contact Nancy Funke at the DOE in the interim if they wished to visit a "sample" of the type of program recommended for A.C.  (*Id.*).  As Fochetta also testified, the placement was deferred — as is customary — because A.C. still had an IEP in place from the previous year.  (*Id.* at 287; *see also id.* at 965 (Notice of Recommended Deferred Placement indicating "[a]lthough you have the right to an immediate placement in this program, the IEP team believes it may be in the best interest of your child to defer placement in this program until June 15, 2011.  The reason to defer placement is: this IEP is developed for [the] 2011-2012 school year.")).

Then, on June 13, 2011, the DOE sent its Final Notice of Recommendation ("FNR"), indicating that it recommended a 6:1:1 placement at public school P176X@P153X in the Bronx.  (R. 984).[10]  The FNR provided contact information for T.C. to visit the school and provided detail on requesting an impartial hearing.  (*Id.*).

---

[10]      "P176X serves students between the ages of 2.9 and 21 years, who are on the autism spectrum.  All services are provided within 5 community schools in the Bronx," including at P.S. 153.  (*See* http://www.p176x.org (last visited Aug. 22, 2016)).

On June 20, 2011, T.C. sent a letter to the DOE stating that she had not, at that time, received a placement recommendation for A.C.,[11] but had concerns that the IEP was "inappropriate to meet [A.C.'s] needs," as it was "vague" and did "not describe or address all of [A.C.'s] needs."  (R. 911). Particularly, T.C. indicated that she was "not clear on how the paraprofessional would meet [A.C.'s] needs because [she felt] he would become dependent on that person."  (*Id.*).  As a result, T.C. stated that she had enrolled A.C. at the Rebecca School and would request an impartial hearing to seek funding for that placement.  (*Id.*).

On August 8, 2011, following receipt of the FNR, T.C. sent another letter to the DOE, stating that she had visited the recommended placement and found "it [was] inappropriate for [her] son."  (R. 916).  T.C. detailed that the placement was "too large," which would render it "overwhelming and inappropriate" for A.C.  (*Id.*).  Further, she noted concerns that A.C. would be unsafe, as "there was a significant police and security population in and around the school building," along with "people smoking what [she] believe[d] was marijuana directly in front of the building."  (*Id.*).  Moreover, T.C. referenced "water puddles on the floor" and "water bugs in the hallway," which she claimed would distract A.C.  (*Id.*).  Apart from these physical issues, T.C. indicated that "the curriculum … [was] inappropriate to meet [A.C.'s] needs," and "the school [could not] appropriate[ly] address [A.C.'s] sensory needs."

---

[11]     T.C. later testified that she received the FNR on the date she sent this letter.  (R. 808).

(*Id.*).  T.C. stated that she "was informed that related services [were] provided as an 'average' and therefore, [her] son [might] not receive all of the mandated related services." (*Id.*).  Additionally, T.C. again expressed the same concern that the IEP would not meet A.C.'s needs, as it was "vague and [did] not describe or address" his needs; she noted once more that she was "not clear on how the paraprofessional would meet [A.C.'s] needs because [she felt] he would become dependent on that person." (*Id.*).  As a result, T.C. indicated that she would keep A.C. enrolled at the Rebecca School and seek reimbursement.  (*Id.*).

### 5.    The Due Process Complaint and the DOE Response

On April 17, 2012, counsel for T.C. sent a letter to the Impartial Hearing Office of the DOE requesting an impartial hearing for A.C.  This Due Process Complaint alleged that: (i) the CSE failed to offer A.C. a procedurally valid and substantively appropriate IEP and program recommendation; (ii) the CSE failed to conduct sufficient evaluations in advance of developing the IEP; (iii) the CSE failed to provide "prior written notice"; and (iv) the CSE failed to provide A.C. with a FAPE.  (R. 904).

More specifically, T.C. contended that the CSE's 2009 evaluations "were inappropriate and insufficient to assess [A.C.'s] needs and abilities," and that the CSE had failed to conduct "updated evaluations of [his] functioning." (R. 904).  Further, T.C. alleged that the DOE "failed to provide adequate notice of the [March 28, 2011 IEP] meeting, as they failed to indicate all expected participants." (*Id.*).  Further, the DOE "failed to include the participation of an adequate parent member" at the CSE meeting and "failed to include the

17

participation of a qualified district representative, someone who is aware of the full range of special education services that could have been offered to [A.C.]." (*Id.* at 904-05).  Moreover, T.C. claimed, "[A.C.'s] current teacher did not participate for the entire CSE meeting."  (*Id.* at 905).

T.C. stated that she believed the CSE's recommendations were made "pursuant to Department of Education policy, rather than based on [A.C.'s] individual needs," including A.C.'s need for "a more structured and individualized setting" like the 8:1:3 class size at Rebecca School, rather than a 6:1:1 class with a 1:1 transitional paraprofessional.  (R. 905).  T.C. asserted that while she expressed concerns about the transitional paraprofessional during the CSE meeting and in a subsequent letter, the CSE did not address her concerns.  (*Id.*).  Further, T.C. stated that while the CSE minutes reflect discussion of parent training and counseling, this was not recommended in the actual IEP.  (*Id.*).

Moreover, T.C. contended that the IEP was inadequate to meet A.C.'s needs, as it contained insufficient detail regarding his strengths, weaknesses, preferences, and needs; further, it did not "provide sufficient information [about A.C.'s] needs and abilities in decoding, reading comprehension, listening comprehension, writing, computation, problem solving, adaptive daily living skills, motor planning and sequencing, and visual-spatial processing." (R. 905).  T.C. also claimed the IEP did not reflect A.C.'s "current functioning in receptive, expressive, pragmatic, and articulation skills," and it did not discuss his "sensory and social/emotional needs."  (*Id.*).  With regard to A.C.'s sensory

18

needs, the IEP did not "provide sufficient supports" or "indicate what sensory tools [A.C.] requires in order to stay regulated throughout the school day." (*Id.*).  Additionally, T.C. stated, the CSE did not sufficiently review A.C.'s progress on the *previous* IEP's goals, and the new IEP reflected goals that were "inappropriate and insufficient" to address A.C.'s needs.  (*Id.*).

With regard to the proposed placement, T.C. indicated that the offer was "inappropriate" because it failed to indicate to which specific class A.C. would be assigned, and further, the placement as a whole could not meet A.C.'s needs.  (R. 905).  T.C. alleged that the curriculum would not provide A.C. "with appropriate instruction," as T.C. was "informed that the methodologies of Applied Behavioral Analysis ['ABA'] and TEACCH" were used; she noted that A.C. had been "previously instructed using these methodologies and they were unsuccessful in meeting his needs."  (*Id.*).[12]

Further, T.C. stated that the placement school would be too large and overwhelming for A.C., adding that it posed a safety risk, based on a "significant police presence and security population" and T.C.'s observation of "people smoking what appeared to be marijuana in front of the school building."  (R. 906).  T.C. described the placement school as "dirty and unsafe,"

---

[12]    "ABA is the use of principles and techniques in order to encourage useful behaviors and discourage harmful ones."  *C.F. ex rel. R.F.* v. *N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 n.3 (2d Cir. 2014).

"TEACCH" refers to "Treatment and Education of Autistic and Related Communication-Handicapped Children," *M.H.*, 685 F.3d at 258, and it "uses a very structured environment with the philosophy that if you create an environment where the child can be successful and independent, they will learn the skill being taught," *D.C. ex rel. E.B.* v. *N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 502 n.12 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted).

19

with water puddles and bugs in the hallway.  (*Id.*).  Finally, T.C. indicated that the proposed placement could not "implement [A.C.'s] IEP as written," as T.C. had been informed during her tour that "related services are provided on an 'average' basis, rather than [based] on individual needs."  (*Id.*).

In its Due Process Response, dated April 20, 2012, the DOE confirmed that it had recommended a "Special Class in a Specialized School," consisting of a 6:1:1 ratio of student to teacher to paraprofessional, in addition to related services of occupational therapy and speech therapy, plus a 1:1 transitional paraprofessional specific to A.C.  (R. 907-08).  The DOE indicated that, in developing the IEP, it had relied upon a "psychoeducational evaluation" and "classroom observation(s)," in addition to "teacher progress reports."  (*Id.* at 908-09).  The DOE's response also noted that the CSE had considered (i) a 12:1:1 special class in a specialized school, (ii) an 8:1:1 special class in a specialized school, and (iii) a 6:1:1 special class in a specialized school without the addition of a paraprofessional, all of which were deemed "not supportive enough."  (*Id.* at 909).  The DOE stated that its FNR, issued on June 13, 2011, offered a placement at P176X@P153X that was "reasonably calculated to enable the child to obtain meaningful educational benefits."  (*Id.*).

### 6.    The Impartial Hearing

In response to Plaintiffs' request, the IHO held an evidentiary hearing on a series of 10 dates: (i) June 1, 2012; (ii) June 5, 2012; (iii) June 25, 2012; (iv) August 13, 2012; (v) October 4, 2012; (vi) October 24, 2012; (vii) November 14, 2012; (viii) January 17, 2013; (ix) January 29, 2013; and (x) March 12,

2013.  (*See* R. 29).  Over the course of the hearing, the parties offered

documentary and testimonial proof to establish and defend their cases.  The

witnesses who testified on behalf of Plaintiffs included T.C. and various

Rebecca School representatives, including program director Tina McCourt,

occupational therapy supervisor Toni Sheridan, teacher Rebecca Lubin, and

speech therapist Jaclyn LoPresti.  School psychologist Rose Fochetta and DOE

IEP Coordinator Camille Blake testified on behalf of the DOE.  (*Id.* at 30-31).

### 7.    The Impartial Hearing Officer's Opinion

On April 18, 2013, Impartial Hearing Officer Gary D. Peters, Esq., issued

his opinion finding that the DOE had failed to offer A.C. a FAPE for the 2011-

2012 school year, and awarding Plaintiffs reimbursement for the cost of the

Rebecca School tuition.  (R. 66).  The IHO first delineated Defendant's case,

recounting argument by Defendant's counsel and testimony from the DOE's

witnesses as to the contents of the IEP, its development during the CSE

meeting, the issuance of the DOE's FNR, and Plaintiffs' subsequent

correspondence opposing the DOE's programmatic recommendation and

placement.  (*Id.* at 33-38).  The IHO related the DOE's responses to Plaintiffs'

various objections, including to the adequacy of evaluative materials (*id.* at 39),

the CSE Parent Member's participation (*id.* at 40), the appropriateness of the

6:1:1 program with the 1:1 transitional paraprofessional (*id.* at 40-41), the

IEP's omission of parent training and counseling (*id.* at 41), the adequacy of the

IEP's description of A.C.'s sensory needs and provision of sensory supports (*id.*

at 41-42), and the appropriateness of the goals set forth in the IEP (*id.* at 42).

21

Finally, the IHO noted the DOE's contention that even if the DOE failed to offer A.C. a FAPE, the Rebecca School would not be an appropriate placement, and the equities would not favor Plaintiffs.  (*Id.* at 42-44).

The IHO then set out Plaintiffs' countervailing argument that the DOE had failed to meet its legal burden of demonstrating that it offered A.C. a FAPE. (R. 44).  As the IHO stated, Plaintiffs contended that the CSE considered insufficient evaluative material relating to A.C., and as a result, the IEP did not contain adequate detail to guide a future instructor as to A.C.'s abilities and needs.  (*Id.* at 44-45).  Further, the IEP incorporated terminology exclusive to the DIR method, though the DOE "disclaim[ed] the recommendation of DIR" after the fact.  (*Id.* at 45-46).  The IHO also recounted Plaintiffs' complaints pertaining to (i) the IEP's failure to adequately describe A.C.'s sensory needs or specify the tools required for his regulation (*id.* at 46-47); (ii) the IEP's failure to describe A.C.'s functioning in the areas of speech and language (*id.* at 47-48); (iii) the CSE's failure "to copy the entire [ ] long-term goals indicated on the Rebecca School report, which directly resulted in 'vague goals'" and inadequate "present levels of performance" (*id.* at 48-49); (iv) the IEP's erroneous instruction that language-related goals would be addressed during occupational therapy, rather than in speech and language therapy (*id.* at 49); (v) the DOE's refusal to require DIR methodology in the IEP (*id.* at 49-50); and (vi) the failure of the CSE to incorporate T.C.'s concerns in the IEP (*id.* at 50). In addition, the IHO related Plaintiffs' claim that upon visiting the placement, T.C. was informed that related services were provided on an average basis,

rather than as mandated by the IEP; when T.C. contacted the DOE indicating this, she did not receive a response.  (*Id.* at 51).  The IHO reiterated in detail Plaintiffs' objection that the placement could not provide the correct teaching methodology (i.e.*,* DIR, as opposed to ABA or TEACCH), and thus, it could not implement the IEP as written.  (*Id.* at 51-53).  The IHO also described Plaintiffs' objection to the transitional paraprofessional, as compared to the appropriateness of the 8:1:3 structure, DIR methodology, and related services of the Rebecca School.  (*Id.* at 53-55).  Finally, the IHO noted Plaintiffs' contention that T.C. had reached out to the DOE with concerns on two separate occasions without receiving a response.  (*Id.* at 55-56).

The IHO next explained the purposes of the IDEA and the DOE's obligations under the statute, both procedural and substantive.  (R. 56-58). The IHO noted that, under the *Burlington-Carter* test, the DOE "may be required to pay for educational services obtained for a child by the child's parents if: [i] the services offered by the [DOE] were inadequate or [in]appropriate; [ii] the services selected by the parents were appropriate and [iii] [e]quitable considerations support the parent[s'] claim."  (*Id.* at 58-59 (citing *Sch. Comm. of Burlington* v. *Dep't of Educ.*, 471 U.S. 359 (1985); *Carter*, 510 U.S. 7)).  The IHO then set forth the relevant burdens of proof: the DOE must "prove or disprove any allegations raised by the Parent in the Request for Due Process," and the Parent must demonstrate the "appropriateness of the services which the parents obtained for the child for the current school year." (*Id.* at 59).  Finally, the IHO noted, the "petitioners' claim [must be] supported

[ ] by equitable considerations," including compliance with state and federal regulations. (*Id.* at 59-60).

Though the IHO opinion is lengthy, most of it is devoted to outlining the parties' arguments; the portion of the opinion *analyzing* the parties' arguments is comparatively short: In the final six pages of his 35-page opinion, the IHO found that (i) the IEP was substantively deficient; (ii) the CSE "did not create a program reasonably calculated to produce educational benefit; (iii) the IEP "was created without the benefit of sufficient evaluative data" and "did not include adequate strategies to address [A.C.'s] academic or behavioral deficits ... [or] a program with adequate supports or an appropriate classroom placement"; (iv) the DOE's procedural violations deprived A.C. of a FAPE; (v) "the DOE never appropriately implemented [A.C.'s] IEP"[13]; (vi) the failure to prescribe parent training was not harmless, and it was "not credible that the recommended placement could have provided this service"; and (vii) the DOE failed to establish that the placement could provide related services as recommended, including sensory equipment (namely, a Lycra swing) and a PROMPT-trained speech therapist. (R. 61-64).[14] As to the second and third prongs of the *Burlington-Carter* test, the IHO determined that the Rebecca School was an

---

[13]   The Court is somewhat perplexed by this statement; because A.C. was placed at the Rebecca School, it is unclear how the DOE logically could have implemented the IEP it developed.

[14]   "PROMPT" is an acronym for "Prompts for Restructuring Oral Muscular Phonetic Targets" and "is defined as a tactile-based therapy technique used for reshaping individual and connected sounds and sound sequences." *E.C.* v. *Bd. of Educ. of City Sch. Dist. of New Rochelle*, No. 11 Civ. 9429 (ER), 2013 WL 1091321, at *2 n.3 (S.D.N.Y. Mar. 15, 2013) (internal quotation marks omitted).

appropriate placement because it "provided [A.C.] with a comprehensive individualized educational program wherein he ha[d] made progress," and the equities favored Plaintiffs, as T.C. "was cooperative, attended [the] meeting and visited recommended placements." (*Id.* at 65-66). Accordingly, the IHO directed reimbursement of the 2011-2012 tuition to Plaintiffs to the extent paid, with the outstanding balance to the Rebecca School. (*Id.* at 66).

### 8.    The State Review Officer Appeal

The DOE thereafter appealed the IHO's decision to the SRO, requesting that the SRO reverse the IHO's determinations that it had failed to offer A.C. a FAPE for the 2011-2012 school year; if such determination were not reversed, the DOE asked that the SRO determine that the equities did not favor Plaintiffs, "because [T.C.] had no intention of ever removing the Student from Rebecca and placing him in a DOE recommended school." (R. 76-77). The DOE argued that (i) it offered A.C. a FAPE for the 2011-2012 school year; (ii) Plaintiffs' allegations of procedural violations were unfounded; (iii) the IEP's recommended program was appropriate; (iv) the recommended placement was appropriate, and Plaintiffs' objections to it were impermissibly speculative; (v) Plaintiffs' unilateral placement of A.C. at the Rebecca School was not appropriate; and (vi) the equities favored the DOE, rather than Plaintiffs. (*Id.* at 81-92).

### 9.    The State Review Officer's Findings

On December 8, 2014, the SRO issued his opinion reversing the IHO's determination and finding that the DOE had indeed offered A.C. a FAPE for the

2011-2012 school year.  (R. 21).  The SRO began by recapitulating the history

of the case, including the CSE's meeting and recommendations and the

impartial hearing before the IHO.  (*Id.* at 10).  As the SRO stated, "[t]he crux of

[the DOE's] appeal [was] whether the March 2011 IEP accurately reflected the

student's educational needs and whether the recommended placement of a

6:1+1 special class with a 1:1 transitional paraprofessional and related services

was an appropriate educational placement for the student."  (*Id.*).

The SRO outlined the purposes underlying the IDEA and the legal

standards applicable to IDEA cases, including the requirements for finding a

student was offered a FAPE.  As the SRO explained, "[a] school district offers a

FAPE 'by providing personalized instruction with sufficient support services to

permit the child to benefit educationally from that instruction,'" though the

IDEA ensures an "appropriate" education, "not one that provides everything

that might be thought desirable by loving parents."  (R. 11-12 (citing *Rowley*,

458 U.S. at 203; *Walczak*, 142 F.3d at 132)).  The SRO recited the

requirements of a substantively valid IEP, including (i) a statement of the

student's present levels of performance; (ii) establishment of annual goals; and

(iii) provision for appropriate special education services.  (*Id.* at 12).  The SRO

also laid out the DOE's burden of proof and obligation to reimburse parents for

private educational services in the event an IEP were deemed inadequate or

inappropriate.  (*Id.* at 12-13).

Next, the SRO described A.C.'s IEP in detail, first addressing the

evaluative information used to formulate the IEP, along with its articulation of

A.C.'s present levels of performance.  (R. 13-15).  The SRO cited the legal standards governing frequency and contents of mandated student evaluations (*id.* at 13), along with the IDEA's requirement that an IEP include a statement of "a student's academic achievement and functional performance and how the student's disability affects his or her progress in relation to the general education curriculum" (*id.* at 14 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)).  The SRO listed the documents consulted by the CSE and noted that, per the record, T.C. and A.C.'s then-current teacher had participated in the CSE meeting and provided relevant information regarding A.C.'s needs.  (*Id.* at 14).  Considering these sources, the SRO determined that the CSE consulted sufficient evaluative information in developing the IEP.  (*Id.*).  With respect to the IEP's discussion of A.C.'s present levels of performance, the SRO stated that the parent was "correct in asserting that the March 2011 IEP lack[ed] information regarding the student's then-current functioning in the area of speech-language development," but nonetheless, the SRO stated that this did not amount to denial of a FAPE; the SRO made this finding in light of testimony that these needs were discussed during the CSE meeting, relevant goals were included in the IEP, and related services were increased from the previous IEP.  (*Id.* at 14-15).

With regard to the substance of the annual goals, the SRO found that the evidence "support[ed] the district's assertion that the IHO erred in determining that the March 2011 IEP goals were vague and inappropriate."  (R. 15).  As he stated, the goals were based upon a progress report drafted by "teachers and

providers who were very familiar with the student's functioning," and the formulated goals on the IEP directly related to the student's needs, which the SRO reiterated from the record.  (*Id.*).  The SRO then addressed Plaintiffs' claim that the IEP implicitly required use of DIR methodology, finding it "without merit" because, in part, "the appropriateness of a particular set of annual goals and short-term objectives for a student turns not upon their suitability for a particular methodology, but rather on whether the annual goals and short-term objectives are consistent with and relate to the identified needs and abilities of the student." (*Id.* at 15-16).  The SRO stated that the record did *not* demonstrate the IEP could only be implemented using DIR methodology.  (*Id.* at 16).

The SRO then addressed the appropriateness of the 6:1:1 class placement with the additional transitional paraprofessional.  (R. 16).  As he noted, the CSE had discussed the IEP with all participants, and had considered and rejected multiple larger ratios, ultimately settling on the more intimate 6:1:1 class structure and adding the transitional paraprofessional in response to T.C.'s concerns about one-to-one instruction.  (*Id.*).  The SRO cited testimony by school psychologist Fochetta that a transitional paraprofessional would provide support for A.C. as he moved from a private school setting to the public school placement, and the SRO observed that it resulted in a ratio similar to A.C.'s level of support at the Rebecca School.  (*Id.* at 16-17).

With respect to the parent's concern about "sensory support" in the IEP, the SRO noted the description of A.C. as "sensory seeking" but "able to

28

maintain a calm and regulated state for the majority of the school day"; the SRO indicated that the IEP accordingly "identified supports to address the student's management needs," including occupational therapy with prescribed sensory processing goals, plus the transitional paraprofessional to offer additional support.  (R. 17).  In sum, he found, the record "support[ed] a finding that the March 2011 [IEP] sufficiently described the student's sensory needs and recommended sufficient supports and services to address those needs."  (*Id.*).

Next, the SRO considered Plaintiffs' complaint that the IEP failed to include parent counseling and training.  (R. 17).  While agreeing that this omission constituted a procedural deficiency, the SRO observed that the DOE was required to provide it in any event; thus, the SRO determined that its absence did not affect the IEP's substantive adequacy.  (*Id.* at 17-18).

The SRO then evaluated Plaintiffs' challenges to the placement site; first, he stated that the parent's claims pertaining to "functional grouping, the methodology utilized, and the physical environment at the assigned public school site" amounted to speculative claims about implementation of the IEP, as A.C. had never actually attended the placement.  (R. 18).  In any event, such challenges would fail, as the record "[did] not support the conclusion that the district would have deviated from the student's IEP in a material or substantial way that would have resulted in a failure to offer the student a FAPE."  (*Id.*).

With regard to Plaintiffs' assertion that DIR methodology was implicitly required but could not be provided by the placement, the SRO stated that "a

CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher." (R. 19 (collecting cases)).  Because (i) the IEP did not indicate consensus on a specific methodology; (ii) the hearing record also did not suggest a clear agreement; and (iii) the record did not demonstrate that A.C. could exclusively progress using DIR methodology based on T.C.'s reference to A.C.'s earlier progress with ABA methodology, the SRO determined that "the parent's claim that the assigned public school site utilized an inappropriate methodology [was] without merit." (*Id.* at 19-20).

Finally, the SRO assessed the IHO's finding that the placement school could not address A.C.'s sensory needs because it did not possess the necessary equipment. (R. 20).  The SRO stated that, per the record, the placement *did* possess sensory equipment, though he also noted that the DOE was not required to furnish every particular piece of equipment (e.g., a Lycra swing) thought desirable by A.C.'s parents.  (*Id.*).  Thus, this finding of the IHO was overturned as well.

### 10.   The Instant Litigation

On April 6, 2015, having exhausted their administrative remedies as required, Plaintiffs filed the Complaint in this action.  (Dkt. #1).  On October 19, 2015, Plaintiffs filed a motion for summary judgment.  (Dkt. #10-11).  Defendant filed its Cross-Motion for Summary Judgment and opposition to Plaintiffs' motion on December 14, 2015 (Dkt. #14-15), and Plaintiffs filed their reply and opposition to Defendant's motion on January 4, 2016 (Dkt. #16).

Defendant concluded briefing by filing its reply memorandum on January 25, 2016.  (Dkt. #17).

## C.      The Standard of Review

In IDEA cases, motions for summary judgment "serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled."  *T.Y.*, 584 F.3d at 418.  For this reason, motions for summary judgment in IDEA cases are "an appeal from an administrative determination" that typically "triggers more than an inquiry into possible disputed issues of fact."  *Lillbask*, 397 F.3d at 84 n.3 (internal citations omitted).

The federal court's role in reviewing these state administrative decisions is, however, "circumscribed."  *R.E.*, 694 F.3d at 189; *see also T.Y.*, 584 F.3d at 417.  A federal court must give "due weight to the state proceedings, mindful that [the court] lack[s] the specialized knowledge and experience necessary to resolve … questions of educational policy."  *R.E.*, 694 F.3d at 189 (internal citation and quotation marks omitted).  "Keeping in mind this 'circumscribed' role, the district court 'engage[s] in an independent review of the administrative record and make[s] a determination based on a preponderance of the evidence.'"  *M.B. ex rel. L.C.* v. *Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77-78 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).  Although a court's review of state administrative decisions "requires a more critical appraisal of the agency determination than clear-error review," it "nevertheless falls well short of complete *de novo* review."  *M.H.*, 685 F.3d at

31

244 (internal citation omitted).  District courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."  *T.Y.*, 584 F.3d at 417 (citing *Rowley*, 458 U.S. at 206).

As relevant here, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."  *M.H.*, 685 F.3d at 241 (citing *A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)).  Where the IHO and SRO reach competing determinations, a court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189.

The deference owed to an SRO's decision depends on the quality of that opinion.  *R.E.*, 694 F.3d at 189.  "Deference is particularly appropriate when the state officer's review has been thorough and careful."  *Id.* at 184 (citing *Walczak*, 142 F.3d at 129).  In reviewing the administrative decision, a district court is directed to assess "the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  *Id.* at 189 (citation and quotation marks omitted).

Judicial review under the IDEA is a "two-part inquiry":

> First, the court asks whether the State complied with the procedures set forth in the Act.  Second, the court asks whether the IEP developed through the Act's

32

> procedures is reasonably calculated to enable the child
> to receive educational benefits. If an IEP is
> deficient — either procedurally or substantively — the
> court then asks whether the private schooling obtained
> by the parents for the child is appropriate to the child's
> needs.

*M.H.*, 685 F.3d at 245 (internal citations and alterations omitted).  In assessing

this last question, "equitable considerations relating to the reasonableness of

the action taken by the parents are relevant."  *Id.* (internal quotation marks

omitted).

## DISCUSSION

### A.   Plaintiffs' Procedural Challenges Do Not Warrant Reversal of the SRO's Decision

Plaintiffs contend that A.C. was denied a FAPE by virtue of various

procedural violations; in particular, they allege that the DOE denied T.C.'s

"meaningful participation as it failed to adequately address [her] concerns" or

"ignored [them] altogether."  (Pl. Br. 16-17).  Specifically, while T.C. informed

the CSE about her concerns regarding A.C.'s "sensory delays, ability to deal

with different tasks and activities, and engage with peers and adults (all areas

that are intrinsically addressed by the DIR 8:1:3 model)," in addition to

concerns about the assignment of a transitional paraprofessional, the CSE did

not address these concerns.  (*Id.* at 17).  Moreover, Plaintiffs claim, the CSE's

Parent Member did not "provide any input during the meeting or address the

parent's concerns," and the IEP ultimately did not reflect T.C.'s concerns.  (*Id.*).

At the outset, the DOE asserts that Plaintiffs have abandoned any

arguments regarding T.C.'s participation *vel non* in the CSE meeting and any

procedural inadequacies at that meeting, based on the SRO's comment that "[t]o the extent that the IHO did not rule on procedural inadequacies in the conduct of the CSE meeting, the parents did not attempt to advance any argument on these points on appeal." (Def. Br. 37 (citing R. 13 n.2)). Plaintiffs dispute this, contending that the argument is preserved by virtue of being raised in the Due Process Complaint. (Pl. Opp. 14-15 (citing *C.U.* v. *N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 223 (S.D.N.Y. 2014)). In any event, Defendant contends, the CSE was "properly constituted," and all members participated and were present for the entirety of the meeting, "follow[ing] the 'cooperative approach' prescribed by the IDEA." (Def. Br. 26-27 (citing *Burlington*, 471 U.S. at 368)).

Again focusing on the merits of Plaintiffs' arguments, Defendant observes that "the record is replete with examples of the Committee providing Plaintiff an opportunity to participate." (Def. Br. 36). Specifically, the IEP meeting minutes reflect feedback from T.C. and from A.C.'s Rebecca School teacher regarding A.C.'s "academic performance, learning characteristics, ... [and] academic management needs," in addition to A.C.'s "social and emotional needs." (*Id.* at 36-37). The DOE also cites numerous excerpts from Fochetta's testimony referencing T.C.'s requests and the CSE's concordant recommendations as evidence that T.C. provided meaningful input that was ultimately incorporated into the IEP. (*Id.* at 37 n.13). As the DOE further argues, "[t]he record [ ] reflects that while the Committee and Plaintiff did not agree on a 6:1:1 program with an extra paraprofessional to help the student with transitions, Plaintiff's

34

concerns were heard and the Committee discussed the role of the paraprofessional with Plaintiff." (*Id.* at 37).  Beyond that, Defendant asserts, Plaintiffs have not put forth any argument as to "how the parent member's *alleged* silence hindered T.C.'s ability to participate in the meeting." (*Id.* at 37-38 (emphasis in original)).

The Court need not address Defendant's waiver argument, because the record is clear that T.C. was an active participant in the CSE meeting, raising concerns about A.C.'s social and academic needs, which resulted in additional related services recommendations in the IEP. (*See, e.g.,* R. 221-22 (adding occupational therapy with a peer to meet T.C.'s request for greater socialization), 222-23 (adding speech and language therapy sessions based on T.C.'s concern about A.C.'s delayed language functioning)). *See Cerra* v. *Pawling Cent. Sch. Dist.*, 427 F.3d 186, 193 (2d Cir. 2005) (holding that a parent receives an opportunity to contribute meaningfully if he or she is "significantly involved in developing [the student's] educational program" and "actively participate[s] in discussing [the student's] needs" (internal quotation marks omitted)).

Separately, with regard to the Parent Member, the Court concurs with Defendant that Plaintiffs have not provided evidence of any detrimental impact of the Parent Member's alleged non-engagement on T.C.'s participation in the CSE meeting. *Cf. S.W.* v. *N.Y.C. Dep't of Educ.*, 92 F. Supp. 3d 143, 155-56 (S.D.N.Y. 2015) ("It is undisputed that the CSE was improperly constituted due to the absence of such a parent member.  The relevant inquiry though, is what

effect the absence of that additional parent member had on the adequacy of [the] IEP and [the student's] parents' opportunity to participate in the decision-making process.").  Because the record here demonstrates that a Parent Member was in attendance, yet fails to show that her alleged non-participation impacted T.C.'s right to participate — indeed, as discussed above, T.C. appears to have been an important participant — this challenge too is unavailing.

Plaintiffs also note that T.C. "was not provided a draft of the IEP during the meeting," leaving her unaware that the DOE had used the Rebecca School Progress Report but failed to "accurately transpose" its goals onto the IEP, which rendered the IEP's goals "inappropriate." (Pl. Br. 18).  However, nothing in the record suggests that T.C.'s failure to receive a draft of the IEP during the course of the meeting prevented her from participating in the CSE's discussion; indeed, her comments and concerns were incorporated into the document. And, after receiving the IEP document, T.C.'s June 20, 2011 letter stated only "I have concerns that [the IEP] is inappropriate to meet [A.C.'s] needs," because it "is vague and does not describe or address all of [his] needs." (R. 911).  T.C. did not indicate that the Rebecca School goals had been inaccurately transposed or that the goals were "inappropriate" for this reason.  In light of T.C.'s failure to raise these concerns, and in deference to the SRO's expertise and reasoned opinion that the goals were neither vague nor inappropriate (*see infra* at 46-48), the Court finds that T.C.'s failure to receive a draft IEP during the meeting did not inhibit her participatory rights or lead to a denial of a FAPE.

36

Next, while T.C. wrote a letter to the DOE regarding her concerns after receiving and reviewing the IEP, she did not receive any response to that letter. (Pl. Br. 18).  Further, Plaintiffs state, T.C. did not receive a placement until three months after the IEP meeting, and then upon scheduling a visit, T.C. was unable to observe the students with whom A.C. would be placed.  (*Id.*).  And when T.C. informed the individual leading her school tour of her concerns regarding A.C.'s "dependency," difficulties with transitions, and sensory processing issues, that individual was unable to provide information about how the school would address these needs.  (*Id.* at 18-19).  Approximately one month after this second visit, on August 8, 2011, T.C. again sent a letter to the DOE expressing concerns about the placement, and again received no response.  (*Id.* at 19; *see also* R. 916).

At the outset, the Court is dismayed by the DOE's insouciance in responding (or, more appropriately, failing to respond) to T.C.'s correspondence.  However, this failure ultimately did not deny Plaintiffs' right to meaningful participation in the IEP process, nor did it amount to denial of a FAPE.  As the Second Circuit has stated, "parents are guaranteed only the opportunity to participate in the decision about a child's educational placement, which refers to the general education program — such as the classes, individualized attention and additional services a child will receive — rather than the bricks and mortar of the specific school."  *R.B. ex rel. D.B.* v. *N.Y.C. Dep't of Educ.*, 603 F. App'x 36, 39 (2d Cir. 2015) (summary order) (internal quotation marks and citation omitted).  Here, a number of

37

concerns expressed in Plaintiffs' second letter — regarding the size, safety, and cleanliness of the school — sound in complaints about the "bricks and mortar" of the placement, rather than the IEP program developed by the CSE.  Further, as discussed in more detail below, certain of Plaintiffs' challenges to the manner in which the IEP would be implemented are impermissibly speculative, relating to the placement's ability to meet A.C.'s sensory needs and related services requirements.

Finally, with regard to T.C.'s expressed concerns about the purported vagueness of the IEP and the utility of the transitional paraprofessional, the Court finds that the failure of the DOE to respond to these concerns — while hardly admirable — did not result in denial of a FAPE.  The record demonstrates that the CSE team discussed the IEP's goals during its March 2011 meeting (*see, e.g.*, R. 761-62 (Lubin's recollection of reviewing the short-term objectives), 802-04 (T.C.'s testimony that the CSE team reviewed academic goals)), and as discussed below, those goals were measurable and contained specific performance objectives (*see infra* at 46-48).  Moreover, the record demonstrates that T.C. had a meaningful opportunity to participate in the creation of the IEP's goals in the first instance, and the DOE's failure to respond to her general comment that the "IEP [was] vague and [did] not describe or address all of A.C.'s needs" does not demonstrate that T.C.'s participatory rights were inhibited in the later stages of the IEP process such that A.C. was deprived of a FAPE.

In the same vein, T.C. stated in both letters that she was "not clear on how the paraprofessional would meet [her] son's needs because [she] fe[lt] he would become dependent on that person." (R. 911, 916).  The Court's review of the record discloses that the transitional paraprofessional was discussed among the CSE team and was added in response to T.C.'s concerns about A.C.'s primary issue of transitional difficulties; as Fochetta testified, the team had a discussion focused on the creation of goals for the transitional paraprofessional, and talked about how he or she would be of greatest utility to A.C.  (*Id.* at 280-81).  The Court finds that Plaintiffs' claim in this regard boils down to a preference for the 8:1:3 classroom ratio at the Rebecca School, and notes that, as the record demonstrates, Plaintiffs received sufficient information regarding the role of the transitional paraprofessional to meet their participatory rights under the IDEA.  *Cf. Sch. for Language & Commun. Dev.* v. *N.Y. State Dep't of Educ.*, No. 02 Civ. 269 (JS) (JO), 2006 WL 2792754, at *7 (E.D.N.Y. Sept. 26, 2006) ("Meaningful participation does not require deferral to parent choice.").  Accordingly, while the District's failure to respond to T.C.'s letters constitutes a procedural violation that should not have occurred and should not be repeated, the Court finds that this failing did not amount to denial of a FAPE.

## B.    Plaintiffs' Substantive Challenges Do Not Warrant Reversal of the SRO's Decision, Although a Limited Remand Is Warranted

Plaintiffs contend that the DOE failed to develop an IEP that would benefit A.C., consequently denying him a FAPE for the 2011-2012 year.  In opposition, the DOE asserts that the IEP was tailored to A.C.'s needs and was

39

"reasonably calculated to enable [A.C.] to receive educational benefits." (Def. Br. 27 (citing *Rowley*, 458 U.S. at 206-07)). As the DOE argues, the IEP "set forth [i] the student's present academic performance and learning characteristics, [ii] his present social and emotional performance and management needs, and [iii] his present health and physical development." (*Id.* at 28). The DOE points to the IEP's 13 goals, drafted to address "expressive and pragmatic speech and language, basic math, visual and verbal cueing, pre-writing skills, sensory processing skills, and interactions with adults and peers," all corresponding to A.C.'s specific areas of need. (*Id.*).

### 1. Plaintiffs' Challenge to the CSE's Evaluative Materials

Plaintiffs contend that the 2011-2012 IEP does not adequately address A.C.'s "specific learning needs" in a number of areas, in part because the DOE did not abide by its mandate to "conduct an evaluation … before … any subsequent significant change in placement." (Pl. Br. 27 (citing 34 C.F.R. § 104.35(a)); *see also* Pl. Opp. 6-8). As Plaintiffs argue, A.C.'s transition from the 8:1:3 program with DIR methodology at the Rebecca School to the 6:1:1 plus paraprofessional program in a public school warranted an evaluation additional to that of the Rebecca School Progress Report. (Pl. Br. 27). Further, Plaintiffs claim the DOE was required to obtain a report with "standardized measurements of A.C.'s functioning as compared to his peers." (*Id.*). Instead, Plaintiffs state, the CSE team had access to an "outdated" 2008 Social History Update, a 2009 Psycho-Educational Evaluation, and a classroom observation; since the CSE team failed to consult these during the meeting, T.C. and A.C.'s

Rebecca School teachers could not comment on their accuracy.  (*Id.* at 28; *see also* Pl. Opp. 7).  Plaintiffs further dispute the utility of the reports themselves — claiming, for example, that the Psycho-Educational Evaluation "provided no recommendations" and that A.C.'s behavior was reportedly atypical for him during the classroom evaluation.  (Pl. Br. 29).  More specifically, Plaintiffs argue that, in advance of the IEP meeting, the DOE erroneously failed to conduct an evaluation allowing it to assess A.C.'s speech and language needs, and the IEP team failed to use the information available in A.C.'s 2009 Psycho-Educational Evaluation to address these needs.  (*Id.* at 20-21).  As a result, Plaintiffs contend, A.C.'s IEP does not reflect his speech and language needs.  (*Id.* at 21).

In opposition, the DOE argues, Fochetta's testimony demonstrates that the CSE "considered all of the available evaluative data," and because the reports reviewed were less than three years old, they were "valid and appropriate sources of information in creating the student's IEP."  (Def. Br. 31-32 (citing 8 N.Y.C.R.R. § 200.4(b)(4))).  Further, the DOE notes, the CSE used evaluative data prepared by the Rebecca School, in addition to in-person feedback from A.C.'s Rebecca School teacher regarding his "performance levels and needs."  (Def. Br. 32).  The DOE also notes that "Plaintiffs[] have not alleged that a new evaluation would have led to different recommendations, nor have they presented evidence that the alleged failure to conduct a new evaluation would have changed the Committee's recommendations."  (*Id.* at 33).

41

As the SRO stated, "a district need not conduct a reevaluation more frequently than once per year unless the parent and the district otherwise agree and the district must conduct one at least once every three years unless the district and the parent agree in writing that such a reevaluation is unnecessary."  (R. 13 (citing 8 N.Y.C.R.R. § 200.4(b)(4))).  Further, while noting that an evaluation must "use a variety of assessment tools and strategies to gather functional, developmental, and academic information," and that the DOE "must ensure that a student is appropriately assessed in all areas related to the suspected disability," the SRO determined that the materials considered by the CSE, in conjunction with active participation by T.C. and Lubin, amounted to "current evaluative information relative to the student, which was sufficient to enable the CSE to develop" the IEP.  (R. 13-14).

During the impartial hearing, Fochetta testified that the team worked primarily from the Rebecca School Progress Report, as it was "a reflection of the individuals who were working with [A.C.] at that time day to day, and who knew his needs best"; Fochetta also stated, though, that the team considered her classroom evaluation of A.C., along with the psycho-educational evaluation.  (R. 214-15, 317).  T.C. confirmed this, testifying that the CSE team "went over the Rebecca School's progress report," and "formed the IEP based on that report," asking T.C. her opinions about certain portions and making notes accordingly.  (*Id.* at 802).  And while Fochetta reviewed the 2010-2011 IEP before the meeting and referenced it during the meeting, the team did not discuss those goals because A.C. had attended the Rebecca School (which did

42

not adhere to that IEP or implement its goals) during that year.  (*Id.* at 283-84). *Cf. F.B.* v. *N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 581 (S.D.N.Y. 2013) (finding that the "psychoeducational update['s] ... absence at the meeting does not carry the day .... [The district psychologist] testified that, per her customary practice, she 'must have' reviewed that update.  The Parents have not offered any basis to challenge that testimony.").

In light of this, the Court finds that the record supports the SRO's assessment that the CSE considered sufficient "current evaluative information" to enable it to develop the IEP.  An IEP team need only "review existing evaluation data," 20 U.S.C. § 1414(c)(1), and "[a]ny additional assessments need only be conducted if found necessary to fill in gaps in the initial review of existing evaluation data," *S.F.* v. *N.Y.C. Dep't of Educ.*, No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *10 (S.D.N.Y. Nov. 9, 2011); *cf. D.B.* v. *N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 331 (S.D.N.Y. 2013) (finding that district's failure to obtain an update evaluation did not amount to denial of a FAPE where the CSE had other "sufficient and accurate information to understand the [s]tudent's present levels of performance").  Here, where the record does not indicate that A.C.'s evaluations were untimely under the statute or that any members of the CSE team, including T.C., objected during the meeting to proceeding without updated evaluations, the Court finds the CSE had sufficient evaluative material to develop a sound IEP.

### 2.   Plaintiffs' Challenge to the Speech and Language Portions of the IEP

Along the same lines, Plaintiffs contend that the IEP did not adequately set forth A.C.'s present levels of performance in the area of speech and language, as it was not specific enough with regard to A.C.'s pragmatic, receptive, expressive, and articulative deficits (Pl. Br. 21-22; *see also* Pl. Opp. 9-10); while A.C.'s abilities were discussed in the Rebecca School Progress Report and with A.C.'s teacher during the IEP meeting, Plaintiffs allege that they were not reflected in the IEP itself, rendering any future teacher underinformed as to A.C.'s baseline abilities (Pl. Br. 22-23).  Moreover, they state, the IEP was deficient insofar as it failed to detail A.C.'s interests and strengths, which would delay any future teacher from "develop[ing] [a] relationship[]" with A.C. and would hinder his learning.  (*Id.* at 22).  Plaintiffs contend that the "vague present levels of performance" necessarily result in denial of a FAPE.  (*Id.* at 23).

Separately, Plaintiffs argue that the IEP did not cite appropriate speech and language goals, as the goals included were not sufficiently precise "to enable the student's teachers to understand the CSE's expectations, and for the student's parents to assess the student's progress during the school year." (Pl. Br. 23; *see also* Pl. Opp. 9).  Plaintiffs instead champion the finding of the IHO that the IEP's goals were inappropriate and insufficiently specific.  (Pl. Br. 24).  Moreover, while the DOE relied on the Rebecca School Progress Report in drafting these goals, the IEP team failed to incorporate the Progress Report's goals in their entirety; as a result, Plaintiffs claim, absent a full and accurate

transcription of the Rebecca School goals, the IEP contains "long-term [ ] goals that fail to indicate what long-term skills will be measured." (*Id.*).

The DOE argues, in response, that "[e]ach of the measurable goals indicated a specific percentage goal of mastery … or a success rate of opportunities," with progress to be measured three times during the school year. (Def. Br. 29-30). Further, the DOE claims that the IEP accurately describes A.C.'s then-present levels of performance and "sets forth detailed goals to address [his] needs so that his classroom teachers would be able to implement the recommendations in the written program." (*Id.* at 33). Specifically, the IEP set forth speech and language goals in the areas of pragmatic language skills, expressive language, and articulation. (*Id.* at 33-34).

While the SRO agreed with Plaintiffs that the IEP "lack[ed] information regarding the student's then-current functioning in the area of speech-language development," he nonetheless determined that this did not amount to denial of a FAPE. (R. 14). As the SRO found in the record, A.C.'s needs were discussed during the CSE meeting, and goals addressing his pragmatic, receptive, and expressive language deficiencies were included in the IEP, along with an increase in related services for speech-language therapy based on T.C.'s request. (*Id.*). Accordingly, the SRO determined, the failure to include a description of A.C.'s speech-language functioning did not rise to the level of denial of a FAPE. (*Id.* at 14-15).

45

This Court defers to the SRO's assessment that a lack of information regarding A.C.'s speech-language functioning, while an error, did not amount to denial of a FAPE, particularly given the hearing testimony and the specificity of the IEP's goals in that regard.  First, as Fochetta testified during the impartial hearing, the CSE team began with the mandates from the 2010-2011 IEP for speech and language therapy, asking T.C. for input.  (R. 221-22).  T.C. expressed concern that A.C.'s "language functioning ... wasn't where it should be [and] that he was still exhibiting significant language delays," and requested an increase in services; accordingly, the CSE team added more speech and language therapy sessions.  (*Id.* at 221-23).[15]  Because the CSE accounted for T.C.'s concerns and the progress reported by Rebecca School staff in formulating objectives for A.C., the IEP's lack of information on A.C.'s baseline functioning in this discrete area does not amount to denial of a FAPE.  *See G.B.* v. *N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 250 (S.D.N.Y. 2015) ("Every aspect of a student's specific educational issues does not need to be detailed in the IEP, as long as the IEP [is] designed to specifically address those issues.");

---

[15]    Although Fochetta acknowledged her erroneous transcription of "occupational therapy" rather than "individual and group speech therapy," Fochetta noted that the substance of the goals referred to language skills and "measure[ment] by speech therapist observation," which would make clear to a reader that such goals were speech- and language-oriented.  (R. 252-53, 254-55, 260-61).  Fochetta also stated that the speech and language goals were based on the Rebecca School Progress Report, and no one at the CSE meeting objected to them.  (*Id.* at 253-56).  The Court credits Fochetta's explanation and agrees with the SRO's assessment in this regard, that "the content of the relevant annual goals targeted needs related to speech-language and were written such that reasonable professionals would interpret the typographical error as a mistake."  (*Id.* at 15).  Such minor errors "do not rise to a procedural violation: to find otherwise, would be to 'exalt form over substance.'"  (*Id.* (citing *M.H.* v. *N.Y.C. Dep't of Educ.*, No. 10 Civ. 1042 (RJH), 2011 WL 609880, at *11 (S.D.N.Y. Feb. 16, 2011))).

*P.G.* v. *N.Y.C. Dep't of Educ.*, 959 F. Supp. 2d 499, 512 (S.D.N.Y. 2013) (finding an IEP reasonable, though it did "not specifically identify[] certain of [the student's] issues," because it "detailed a program that was designed to address precisely those issues"); *cf. K.F.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 1126 (RJS), 2016 WL 3981370, at *10 (S.D.N.Y. Mar. 31, 2016) (finding that failure to include a "baseline" in terms of present performance is not fatal to the IEP where measurable goals are structured "in absolute terms and can be measured without reference to a baseline").

With regard to Plaintiffs' assertion that the IEP's goals were not sufficiently precise "to enable the student's teachers to understand the CSE's expectations" or for the parents to assess progress, the Court notes that the IEP's goals almost all contain short-term objectives with quantifiable assessments.  (R. 971-78).  For example, A.C.'s "expressive" language goals include an objective that he "will consistently use 4-5 word utterances to serve a variety of language functions in at least 80% of each therapy session" (*id.* at 976); for his "receptive" language goals, A.C. "will respond to increasingly abstract why and how questions regarding a present situation[] in 8/10 opportunities" (*id.*).  Such objectives are sufficient to find that the DOE provided a FAPE.  *See, e.g.*, *A.S. ex rel. Mr. S.* v. *N.Y.C. Dep't of Educ.*, No. 10 Civ. 9 (ARR) (RML), 2011 WL 12882793, at *13-14 (E.D.N.Y. May 26, 2011) (affirming SRO's finding that goals and strategies were sufficient where they "include[d] objective criteria by which to judge progress, including numbers of particular words to master and specific target percentages of accuracy for the

student to attain in various tasks, including the number of trials to be performed in order to test the student"), *aff'd sub nom. A.S. ex rel. S.* v. *N.Y.C. Dep't of Educ.*, 573 F. App'x 63 (2d Cir. 2014) (summary order); *see also Tarlowe* v. *N.Y.C. Bd. of Educ.*, No. 07 Civ. 7936 (GEL), 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008) (finding an IEP included "sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for the measurement of progress" (internal quotation marks omitted)); *cf. D.A.B.* v. *N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 359 (S.D.N.Y. 2013) ("When an IEP contains a significant number of specific short-term objectives to supplement otherwise broad annual goals, the vagueness of the annual goals alone will not rise to the level of denial of a FAPE.").

In light of the manifest specificity of the IEP's objectives, the Court defers to the SRO's superior expertise in determining that the IEP's goals were sufficiently precise and "directly relate[d] to the student's identified needs." (R. 14-15). *See Grim* v. *Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

### 3. Plaintiffs' Challenge to the Sensory Portions of the IEP

Plaintiffs next argue that the DOE failed to conduct an assessment to determine A.C.'s sensory and occupational therapy needs. (Pl. Br. 25; *see also* Pl. Opp. 10). Relatedly, they claim the IEP did not adequately specify the

sensory tools A.C. required to get through the school day, rendering its references to his sensory needs "meaningless for someone who [was] unfamiliar" with his specific requirements; in particular, the IEP did not mention A.C.'s issues with his "visual-spatial processing system" (i.e., that he was easily distracted) and his need for "vestibular input," including a Lycra swing and a "foof chair." (Pl. Br. 25-26). Accordingly, Plaintiffs argue, the IEP amounts to "an inappropriate program that could not provide A.C. with the *individualized* sensory tools and programming that he requires to make meaningful educational progress." (*Id.* at 26 (emphasis in original)). While the SRO found that A.C. was "sensory seeking" but can "maintain a calm and regulated state for the majority of the school day" (R. 17), Plaintiffs assert that the SRO's decision is not supported by the facts in evidence (Pl. Br. 26-27). As a result, they claim, the IEP's failure to address A.C.'s specific sensory needs amounts to denial of a FAPE. (*Id.* at 27).

As the DOE contends in opposition, the IEP "identified supports to address the student's sensory needs, which included 'redirection, repetition, visual cues, verbal prompts, sensory input and breaks, access to a quiet space, [and] movement during activities.'" (Def. Br. 35 (citing R. 968, 974)). The DOE states that the IEP was "consistent with the evaluative reports that suggested that the student showed improvement when given access to sensory input and breaks," and further, neither T.C. nor A.C.'s Rebecca School teacher objected to these goals when they were read aloud during the CSE meeting. (Def. Br. 35).

With regard to sensory supports, the Court finds that the record supports the SRO's assessment that the IEP adequately described A.C.'s sensory needs, including repetition, visual cues, verbal prompts, sensory input and breaks, access to a quiet space, and movement during activities.  (R. 17). As discussed above, the evaluations considered were sufficiently recent and were not disputed by T.C. or by A.C.'s Rebecca School teacher during the CSE meeting.  (*See* N.Y.C.R.R. § 200.4(b)(4); R. 13-14).  Further, as Fochetta testified, the CSE team discussed A.C.'s needs for tactile and proprioceptive input, though the "actual tools" were typically determined by the teachers and individuals working directly with the student, allowing the IEP "to remain somewhat fluid for at least a year."  (R. 282-83, 322).

Next, although the SRO deemed Plaintiffs' challenges to the placement site speculative inasmuch as A.C. never attended the school (R. 18), he ultimately determined that a challenge to the placement's *capacity* to implement the sensory portions of the IEP would fail as well.  (*Id.* at 18-20).  As the SRO stated, "[c]ontrary to the IHO's conclusion that the assigned school did not have required equipment to meet the student's sensory needs, the curriculum support teacher from the assigned school testified that there was sensory equipment in the building," and any lack of a particular type of therapeutic swing would not render the services inadequate.  (*Id.* at 20).

This Court agrees.  With regard to any capacity-based challenge, as Blake testified, the placement site *could* provide sensory equipment, including,

*inter alia*, swings, trampolines, and scooters.  (R. 434-36).[16]  When asked about determination of specific sensory tools useful for A.C., Blake testified that those at the placement school "would have read the IEP; [ ] would have done a sensory profile, and the [occupational therapist], [physical therapist], classroom teacher, and all of us [would] sit down and come up with that."  (*Id.* at 433).

Moreover, although Plaintiffs reference A.C.'s need for a Lycra swing and "foof chair," such particularized complaints are inadequate to deem an IEP inappropriate.  The IEP need not provide "every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199, and "[t]he IDEA guarantees only that students with disabilities are provided an appropriate education, not one that provides everything that might be thought desirable by loving parents," *Bryant* v. *N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) (internal quotation marks omitted).  Accordingly, the Court affirms the SRO's determination that the IEP adequately described "sufficient supports and services" to address A.C.'s sensory needs.

### 4.    Plaintiffs' Challenge to the Recommendation of a 6:1:1 Program with a 1:1 Transitional Paraprofessional

Plaintiffs next argue that the IHO correctly found that A.C.'s IEP was not "reasonably calculated to produce educational benefit," and they contend that "the record unequivocally supports the fact that a 1:1 transitional paraprofessional is inappropriate for A.C."  (Pl. Br. 29).  Plaintiffs point to

---

[16]    While retrospective testimony is prohibited insofar as it "materially alters the written plan," *R.E.*, 694 F.3d at 186, such testimony responding to this purportedly capacity-based challenge is not "use[d] … to rehabilitate an otherwise deficient IEP," *M.O.* v. *N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir. 2015), and is thus permitted.

testimony by McCourt and Lubin that A.C. requires a number of adults working to help generalize his skills, rather than a 1:1 assigned paraprofessional, on whom A.C. might become dependent.  (*Id.* at 30).  In this regard, Plaintiffs contrast "1:1 instruction" with "1:1 support," contending that the DOE and SRO incorrectly conflated the two.  (Pl. Opp. 11).  Further, Plaintiffs allege that the District "presented impermissible testimony" at the impartial hearing to support its recommendation, while T.C.'s expressed concerns went unacknowledged and unanswered prior to the hearing.  (Pl. Br. 30-31).  Plaintiffs claim that no evidence in the record supports the DOE's contention that the paraprofessional could implement the purportedly DIR-based goals; moreover, the record shows inconsistencies as to whether a paraprofessional would be providing goal-oriented instruction in the first place. (*Id.* at 31).

Plaintiffs also allege that "[t]he SRO misstates the parent's testimony, arguing that the parent testified she 'did not want the student to become attached to someone during the transition,'" whereas T.C. actually indicated that she "didn't want [A.C.] to become attached to *somebody instructing him with transition.*"  (Pl. Br. 31-32 (emphasis in original)).  Overall, Plaintiffs contend, the SRO's decision on this point was neither well-reasoned nor thorough, "provid[ing] no analysis as to how the 6:1:1 program [would] address

A.C.'s specific needs," and accordingly, should not be accorded any deference. (*Id.* at 32-33).[17]

As the DOE counters, the SRO "discussed the individual needs of the student and the concerns expressed by Plaintiff during the IEP meeting," and "found that the Committee recommended adding an additional paraprofessional to the 6:1:1 program specifically to address Plaintiff's concerns about transitioning between environments and providing more individualized attention." (Def. Br. 21-22). And, as Fochetta testified, the transitional paraprofessional was assigned goals in the IEP of "expand[ing [A.C.'s] interactions with both adults and peers and [ ] help[ing] him deal with novel situations" (R. 258), which objectives the IEP reflects (*see id.* at 977 ("In one year, given the support of a special education teacher and a 1:1 transitional Paraprofessional, [A.C.] will expand his ability to remain in longer and more complex interactions with both adults and peers[.]"), 978 ("In one year, given the support of a special education teacher and a 1:1 transitional Paraprofessional, [A.C.] will expand his ability to remain in a co-regulated interaction through a range of emotions[.]")).

At the outset, as the SRO stated in his opinion, "[s]tate regulations provide that a 6:1+1 special class placement is designed for students 'whose

---

[17]    The DOE contends, on reply, that while the SRO came to a reasoned conclusion that a 6:1:1 program was appropriate, the IHO, in contrast, did not even consider the reasonableness of this recommendation. (Def. Reply 9). The Court acknowledges that the IHO never specifically addressed Plaintiffs' contention that the 6:1:1 program was inappropriate, only indicating more generally that the IEP was "substantively deficient" and unlikely to produce educational benefits, and that it contained inadequate supports and an inappropriate classroom placement. (R. 61-63).

management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention.'"  (R. 16 (citing 8 N.Y.C.R.R. § 200.6(h)(4)(i)(a))).  The SRO took into account the CSE's consideration of larger class sizes (12:1:1 and 8:1:1), finding both insufficiently supportive.  (*Id.* at 16).  The SRO also noted the CSE's meeting minutes, which indicated that T.C. and Lubin "expressed reservations" regarding the 6:1:1 class structure, with Lubin "indicat[ing] that [A.C.] required a lot of one-to-one instruction," in response to which the CSE "recommended the addition of a 1:1 transitional paraprofessional to increase the level of support."  (*Id.*).  The SRO acknowledged T.C.'s concern that A.C. would become attached to the paraprofessional, but he observed that T.C. testified that A.C.'s "main issue" was his "inability to take in change or things that did not go his way."  (*Id.* (citing R. 811)).  Weighing this evidence, the SRO found the recommendation of a transitional paraprofessional appropriate, concurring with Fochetta's testimony that the paraprofessional would help to support A.C. as he moved from the Rebecca School to a public school environment.  (R. 17).

Here, while acknowledging the validity of Plaintiffs' concerns regarding the possibility of A.C. becoming attached to the paraprofessional, the Court defers to the SRO's reasoned opinion that the paraprofessional would ameliorate A.C.'s "main issue" of transitional difficulties.  *See A.S. ex rel. Mr. S.*, 2011 WL 12882793, at *15 ("In assuring that the requirements of the IDEA have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States.  A reviewing court may not

meddle in state educational methodology or second-guess educators' policy decisions in the effort to maximize a handicapped child's educational potential." (internal quotation marks and alterations omitted)).  Further, while Plaintiffs contend that Defendant failed to demonstrate a transitional paraprofessional could implement these goals, this amounts to a speculative challenge inappropriate at this stage and a "substantive attack[] on [the] IEP that [was] couched as [a] challenge[] to the adequacy of [the placement]."  *See M.O.*, 793 F.3d at 245.  To the extent Plaintiffs claim the transitional paraprofessional's goals could only be implemented by DIR methodology, however, this contention is addressed below.  *See infra* at 61-64.

### 5.  Plaintiffs' Challenge to the Absence of Parent Training and Counseling

Plaintiffs next challenge the IEP as legally inadequate based on its failure to provide for parent counseling and training.  (Pl. Br. 33).  While the SRO acknowledged this as error, Plaintiffs state, he incorrectly determined that this failure did not result in denial of a FAPE for A.C.  (*Id.*).  As they argue, the IHO was correct in finding that this error was "not harmless" and that "the evidence [was] not credible that the recommended placement could have provided this service."  (*Id.* (citing R. 63-64)).  Plaintiffs contend that, based on the record, such training would *not* have been provided, as it was not included on the IEP.  (Pl. Br. 33-34).

As Defendant argues in response, "New York educational law mandates counseling for parents of students with autism, regardless of whether parent training is included on the face of an IEP."  (Def. Br. 38).  And, as the Second

Circuit has held, the "failure to include parent training in [an] IEP [does] not rise to the level of a denial of a FAPE, even when considered cumulatively with [other] deficiencies." *R.E.*, 694 F.3d at 193.

The Court finds Defendant's argument persuasive. While Plaintiffs are correct that the IEP should have included parent counseling, such error generally does not affect the substantive adequacy of the IEP. *See L.O.* v. *N.Y.C. Dep't of Educ.*, 822 F.3d 95, 122 (2d Cir. 2016) ("We have repeatedly held, however, that parental counseling and training omissions are 'less serious' procedural violations because the presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the IEP. Moreover, because school districts are required … to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP." (internal quotation marks and alterations omitted)). Moreover, the record reflects that T.C. was informed of parental training during the CSE meeting (*see* R. 264-66 (Fochetta testifying that the CSE discussed parent training with T.C., who did not voice objections), 982 (IEP indicating "parent training discussed")), and Blake testified that it was indeed available at the placement (*see id.* at 378 (indicating that the placement has training sessions on "communication, [ ] augmentative devices; [the] IEP; going over the IEP so you can better understand it; … behavioral trainings; [parents] can come in and see all of the programs that are used in their kids' classrooms [and] the teachers go over it so they can understand exactly what

each program does and what [its] ultimate goal is; behavioral [training]; toileting.  We have a wide variety based on the needs of the parents.")).

Accordingly, the Court affirms the SRO's determination that "while the district's failure to provide parent counseling and training in the March 2011 IEP in this instance constituted a procedural violation of State regulations, there is no evidence in the hearing record that this violation, by itself, resulted in a denial of a FAPE."  (R. 18).  Nor, the Court notes, is there any support for Plaintiffs' contention that such services would not or could not have been provided at the placement.

### 6.    Plaintiffs' Substantive Challenges to the Placement

Plaintiffs challenge not merely the IEP but the placement suggested by the DOE, claiming that Defendant failed to rebut T.C.'s claims regarding the appropriateness of the proposed placement.  (Pl. Br. 34; *see also* Pl. Opp. 12-13).  Specifically, T.C. was informed, when she visited the placement, that related services were provided on an "average basis," and this was "corroborated by the school's special education service delivery report submitted into evidence at the hearing."  (Pl. Br. 34-35).  When T.C. raised this in a letter to the DOE, she did not receive any response or confirmation that A.C. would receive related services as specified by his IEP.  (*Id.* at 35).  Further, Plaintiffs claim, "Blake admitted [at the hearing] that she did not know if all the students at P176X actually received their related services, and she was unfamiliar with what related services the other students in the proposed class were receiving.  (*Id.*; *see also* Pl. Opp. 14).  Plaintiffs also argue that the SRO

did not address the placement's ability to meet A.C.'s related services mandates.  (Pl. Br. 35).

The DOE responds that Plaintiffs' challenges to the placement's ability to provide occupational and speech therapy, based on a DOE service delivery report and the statement of an unknown employee, are not sufficient to demonstrate that the plan was not substantively adequate.  (Def. Br. 41-42).  In any event, Defendant argues that this amounts to another speculative challenge, rather than a challenge to the placement's capacity to implement A.C.'s IEP.  (*Id.* at 43).

The Court concurs with Defendant on this point, as its "evaluation must focus on the written plan offered to the parents."  *R.E.*, 694 F.3d at 195.  In circumstances similar to this case, the Second Circuit has held that "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  *Id.*; *see also M.S. ex rel. M.S.* v. *N.Y.C. Dep't of Educ.*, 734 F. Supp. 2d 271, 279 (E.D.N.Y. 2010) ("The summary data in the Special Education Service Delivery Report indicate that [the placement] has not always delivered full special education services to all of its students who require them, but this bare fact does not mean that the school would have been incapable of providing the services to [the student] required by his IEP.").  Indeed, "[a] suggestion that some students are underserved cannot overcome the 'particularly important' deference that we afford the SRO's assessment of the plan's substantive adequacy."  *R.E.*, 694 F.3d at 195.

Along the same lines, echoing Plaintiffs' earlier challenge to the sensory portions of the IEP, Plaintiffs claim that the placement did not have "appropriate sensory tools" to meet A.C.'s needs, including a Lycra swing, rendering it unable to deliver the necessary services.  (Pl. Br. 36).  The DOE contends, in opposition, that (i) a swing was not actually mandated by A.C.'s IEP, and, as the SRO observed, (ii) the testimony indicated that the building contained sensory equipment, including swings.  (Def. Br. 23).  Further, the DOE argues, while this challenge is "framed as an attack on the capacity of the placement site to provide sensory equipment," it is in fact a substantive challenge to the IEP; in this regard, because the IEP did not mandate a Lycra swing, the ability *vel non* of the placement site to provide such a swing is irrelevant.  (*Id.* at 41).

As Defendant also states, Plaintiffs' challenges purportedly based on capacity are unfounded, as T.C. "did not observe any students or teaching methods during her visit, did not speak with any teachers, and did not observe either the gym or occupational therapy room in use."  (Def. Br. 41 n.18).  Accordingly, Defendant argues, her observations were "insufficient" to determine the placement could not carry out the IEP and were based solely on conjecture about what the placement would or would not do.  (*Id.*).

For the same reasons discussed above, *see supra* at 50-51, this challenge by Plaintiffs falls short.  "The mere fact that the student's parent did not observe various specified equipment when he visited the assigned public school is insufficient to establish that the IEP would not have been properly

59

implemented." *E.P. ex rel. E.P.* v. *N.Y.C. Dep't of Educ.*, No. 14 Civ. 6032 (ARR), 2015 WL 4882523, at *7 (E.D.N.Y. Aug. 14, 2015) (internal quotation marks omitted); *see also N.K.* v. *N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 592 (S.D.N.Y. 2013) ("The fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that [the proposed placement] lacked such equipment or that the school would not obtain the equipment necessary to implement [the student's] IEP should [he] attend the school."). Moreover, Plaintiffs' concerns about a Lycra swing are unavailing, as the IEP (i) did not mandate one and (ii) need not provide "every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199. Accordingly, as the SRO deemed the substance of the IEP's sensory supports adequate, Plaintiffs' speculative claim that the placement could not deliver the necessary services cannot suffice to demonstrate denial of a FAPE.

Finally, Plaintiffs challenge the proposed placement on the ground that it would not utilize DIR methodology, on which the IEP was based. (Pl. Br. 36-37).[18] As Plaintiffs note, the CSE used the Rebecca School Progress Report in developing the IEP, and ultimately, it incorporated DIR terminology in six short-term objectives and based A.C.'s related service goals on the DIR model. (*Id.* at 37). Thus, Plaintiffs claim, the DOE impliedly required use of the DIR

---

[18]    Along the same lines, Plaintiffs contend that the SRO "failed to conduct a 'thorough and careful analysis' of whether the evaluations [discussed during the CSE meeting] were *supportive* of terminating the DIR methodology as part of A.C.'s programming." (R. 28 (emphasis in original)).

methodology in drafting A.C.'s IEP, but it then designated a program that, based on the record, could not implement the necessary methodologies.  (*Id.*).[19]

In opposition, Defendant asserts that Plaintiffs' claim that the IEP implicitly required DIR is "not supported on the record, nor is the parent's preference for the DIR methodology a valid reason to find the IEP defective when there was no consensus that DIR was the only method that could be used with the student."  (Def. Br. 29).  Defendant contends that this challenge is, instead, an impermissibly speculative "attack on the substantive recommendations in the IEP."  (*Id.* at 40).

Here, the Court cannot agree with Defendant.  The Second Circuit has hesitated to find an IEP substantively adequate where it incorporates terminology pertaining to a particular methodology, often DIR, without explicitly designating that methodology for the student.  In one case, where an IEP adopted goals created by the Rebecca School using DIR methodology, the Second Circuit remanded to the district court, with instructions to remand to the SRO, to "determine, in the first instance, whether the DOE denied [the student] a FAPE by adopting the Rebecca School's goals without also adopting

---

[19]    Relatedly, Plaintiffs contend that the placement could not provide PROMPT therapy as designated by the IEP.  (Pl. Br. 38).  In support, Plaintiffs refer to Blake's testimony that she was not sure whether the placement's speech therapists were trained in PROMPT therapy.  (R. 456-57).  Here, however, the Court deems Plaintiffs' challenge only speculative, as they have provided no reason to believe — apart from one individual's uncertainty about related services providers' trainings — that the placement would *not* utilize PROMPT therapy.  *See N.S.* v. *N.Y.C. Dep't of Educ.*, No. 13 Civ. 7819 (VEC), 2014 WL 2722967, at *13 (S.D.N.Y. June 16, 2014) ("Absent *non-speculative* evidence to the contrary, it is presumed that the placement school will fulfill its obligations under the IEP." (emphasis added)).  This challenge amounts to a determination that the placement would simply fail to adhere to the IEP's mandates, as Plaintiffs provide no reason to think the placement actually lacked the designated services.

the 'DIR/Floortime' methodology."  *E.H.* v. *N.Y.C. Dep't of Educ.*, 611 F. App'x
728, 731-32 (2d Cir. 2015) (summary order).  While acknowledging the
deference due to state administrators regarding "appropriate educational
methodology," the Second Circuit required an "assess[ment] [of] whether the
IEP [was] likely to produce progress toward [the student's] goals even without
that [DIR] teaching methodology."  *Id.* at 731.  Indeed, the Court stated that
"[i]t would be imprudent for this panel, without any educational expertise, to
evaluate if the 'DIR/Floortime' methodology is necessary to implement the goals
in the IEP."  *Id.* (internal quotation marks omitted).  This Court agrees.

Along similar lines, courts within this Circuit have found IEPs
inadequate where they incorporate a precise methodology that cannot be
implemented by the placement.  For instance, in *F.B.* v. *N.Y.C. Dep't of Educ.*,
132 F. Supp. 3d 522, 550-51 (S.D.N.Y. 2015), Judge Engelmayer of this
District determined that the subject IEP adopted DIR methodology by listing
goals that referenced "continuous flow of communication," "two-way purposeful
communication," "pleasurable back and forth flow of communication," and
"circles of communication."  As he stated, "[t]he CSE therefore implicitly
intended that [the student] receive instruction from teachers in position to
implement this approach."  *Id.* at 551.  Because the teacher who would have
instructed the student in *F.B.* testified that "she neither understood nor could
have implemented these goals" as she "was not trained in DIR/Floortime" and
was unfamiliar with the goals and terminology, Judge Engelmayer determined
that those goals could not be implemented by the placement.  *Id.*  In

conjunction with other enumerated shortcomings, he determined that this denied the student a FAPE.  *Id.* at 553.

Here, the SRO stated that "there [was] no evidence in the hearing record suggesting that there was a clear consensus that the Student's IEP should be limited to one particular methodology to the exclusion of other approaches and it [did] not appear that a particular methodology was contemplated by the March 2011 CSE." (R. 19).  Indeed, Lubin testified that she did not recall informing the IEP team that the goals were based on DIR methodology (*id.* at 728-29), and McCourt testified that terms used in the sensory portion of the IEP were not exclusive to DIR methodology (*id.* at 602-04).  Further, T.C. testified that the implementation of DIR methodology was a concern, but "not one of [her] main issues" (*id.* at 846), and T.C. referenced A.C.'s progress during kindergarten with the TEACCH methodology (*id.* at 800 ("The TEACCH did help him get through a majority of his . . . temper tantrums or inability to regulate.")), suggesting A.C. could progress using methods other than DIR.

The SRO is also correct that "a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter left to the teacher." (R. 19 (collecting cases)).  Indeed, "[d]ecisions involving a dispute over an appropriate educational methodology, such as the necessity *vel non* of ABA, DIR Floortime or a sensory gym, are subject to considerable deference." *N.S.*, 2014 WL 2722967, at *6 (internal quotation marks omitted).  Generally, "[s]o long as the methodologies referenced in the IEP are appropriate to the student's needs, the

omission of a particular methodology is not a procedural violation." *R.B.* v. *N.Y.C. Dep't of Educ.*, 589 F. App'x 572, 576 (2d Cir. 2014) (summary order).

On this record, the Court cannot say that the SRO engaged sufficiently with the IEP's use of DIR-specific terminology when he determined that "there [was] no evidence in the hearing record suggesting that there was a clear consensus that the student's IEP should be limited to one particular methodology to the exclusion of other approaches and it [did] not appear that a particular methodology was contemplated by the March 2011 CSE." (R. 19). While the SRO referenced McCourt's testimony that other educational methodologies could meet A.C.'s "co-regulation" and sensory needs, the SRO did not determine whether the IEP as a whole — and in particular, the goals incorporating DIR-related terminology — was likely to produce progress for A.C. absent use of DIR methodology. *See E.H.*, 611 F. App'x at 731. Accordingly, the Court remands for a determination by the SRO on this limited ground.

## CONCLUSION

For the foregoing reasons, the Court remands to the SRO for a limited determination as to whether the IEP was reasonably calculated to enable A.C. to make educational progress in light of its implicit adoption of DIR methodology as to some goals. In all other respects, the Court affirms the well-reasoned conclusions of the SRO, granting Defendant's motion for summary judgment and denying Plaintiffs' motion for summary judgment. The Clerk of

Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      August 24, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge